800 F.2d 1280
 123 L.R.R.M. (BNA) 2289, 55 USLW 2186,
104 Lab.Cas. P 11,950
 Harry E. BECK, Jr.; Doris R. Ambrose; Jacqueline S.
Brandon; Mary Anna Cox; Sally B. DiMauro; Rue T.F.
Downey; Kathleen A. Heil; John J. Hurley; Harriett
Lipschultz; Clay B. Lutz; Barbara McGaughey; Roland R.
Merkle; Ethel T. Merryman; Doris J. Morrow; Marion F.
Northrop; Frances M. Philips; Vivian Reedy; Barbara A.
Russell; Lois A. Stallings; Harry B. Swartz, Sr., Appellees,
v.
COMMUNICATIONS WORKERS OF AMERICA (C.W.A.), an
unincorporated Labor Organization; C.W.A. Committee on
Political Education (C.W.A. COPE); C.W.A. District II;
Local 2100 of C.W.A.; Local 2101 of C.W.A.; Local 2108 of
C.W.A.; Local 2110 of C.W.A., Appellants,
and
Local 2350 of C.W.A.; American Federation of Labor-Congress
of Industrial Organizations (AFL-CIO), a Federation of
National and International Labor Organizations; AFL-CIO
Committee on Political Education; Maryland State AFL-CIO;
American Telephone & Telegraph, a Corporation; C & P
Telephone Company of Maryland, a Corporation, Defendants.
Harry E. BECK, Jr.; Doris R. Ambrose; Jacqueline S.
Brandon; Mary Anna Cox; Sally B. DiMauro; Rue T.F.
Downey; Kathleen A. Heil; John J. Hurley; Harriett
Lipschultz; Clay B. Lutz; Barbara McGaughey; Roland R.
Merkle; Ethel T. Merryman; Doris J. Morrow; Marion F.
Northrop; Frances M. Philips; Vivian Reedy; Barbara A.
Russell; Lois A. Stallings; Harry B. Swartz, Sr., Appellants,
v.
COMMUNICATIONS WORKERS OF AMERICA (C.W.A.), an
unincorporated Labor Organization; C.W.A. Committee on
Political Education (C.W.A. COPE); C.W.A. District II;
Local 2100 of C.W.A.; Local 2101 of C.W.A.; Local 2108 of
C.W.A.; Local 2110 of C.W.A., Appellees,
and
Local 2350 of C.W.A.; American Federation of Labor-Congress
of Industrial Organizations (AFL-CIO), a Federation of
National and International Labor Organizations; AFL-CIO
Committee on Political Education; Maryland State AFL-CIO;
American Telephone & Telegraph, a Corporation; C & P
Telephone Company of Maryland, a Corporation, Defendants.
 Nos. 83-1955, 83-1956.
 United States Court of Appeals, Fourth Circuit.
 Argued April 8, 1986.
Decided Sept. 12, 1986.
 
 Laurence Gold (James Coppess, George Kaufman, Washington, D.C., on brief), for appellants/cross-appellees.
 Edwin Vieira (Joseph J. Hahn, Nat. Right to Work Legal Defense Foundation, Inc., on brief), for appellees/cross-appellants.
 Before WINTER, Chief Judge, and RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, CHAPMAN and WILKINSON, Circuit Judges, sitting en banc.
 PER CURIAM:
 
 
 1
 In this cause, the existence of federal jurisdiction constituted the dividing issue both between the majority and dissenting panel opinions, as reported in 776 F.2d 1187 (4th Cir.1985), as well as in the en banc hearing. Without reviewing the extended discussion of this issue in the two panel opinions, which delineated adequately the difference in the Court on the dispositive issue of jurisdiction, it seems sufficient for purposes of this en banc decision to summarize the ultimate jurisdictional decision as stated in the two panel opinions, beginning first with the majority opinion.
 
 
 2
 The majority panel opinion found first that the exaction of union dues from non-consenting non-union employees under an agency contract beyond the requirements for purposes of collective bargaining, grievance adjustment or contract administration was "a clear breach of section 8(a)(3) [of the NLRA] and of the union's duty of fair representation." It then concluded that federal jurisdiction "over plaintiffs' statutory suit against defendant union under section 8(a)(3) and for breach of the duty of fair representation was properly invoked under 28 U.S.C. Sec. 1337." 776 F.2d at 1204-05.[1] The majority opinion opined that, having found federal jurisdiction for violation of both the statute and the duty of fair representation, it seemed "unnecessary ... to consider the constitutional basis for jurisdiction" id., but despite this, it proceeded to state that on constitutional grounds jurisdiction in the cause was sustainable even though it had earlier recognized that decisions on constitutional grounds should be avoided if the matter could be resolved on statutory grounds. See 776 F.2d at 1198 and International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).
 
 
 3
 The dissenting panel opinion, on the other hand, concluded that Sec. 8(a)(3) of the NLRA "cannot fairly be read to impose" on unions under an agency shop agreement the obligation to use agency shop fees only "for purposes ... directly related to collective bargaining, grievance adjustment, or contract administration" as against objecting non-union employees. 776 F.2d at 1214. As the dissent puts its position, "[b]oth the language of Sec. 8(a)(3) and its legislative history show that Congress did not intend to limit the use of agency shop fees under the NLRA. Further, the history and purpose of this provision differs from the history and purpose of the agency shop provision in the Railway Labor Act; thus the Railway Labor Act's limits on fee use should not be engrafted onto the NLRA's Sec. 8(a)(3)." 776 F.2d at 1215. Nor, the opinion continues, can such exaction by the union of these dues to be used for purposes not related to "collective bargaining, grievance adjustment or contract administration" represent a cognizable constitutional claim because the union's "use of [such non-consenting employees'] fees does not constitute state action." 776 F.2d at 1214. The dissenting opinion did not discuss the maintainability of the action as one for a violation of the duty of fair representation by the union under Sec. 1337.
 
 
 4
 After the filing of the panel opinions, en banc hearing of the cause was voted. At the en banc hearing, the arguments of the parties focused on the existence of federal jurisdiction of the cause. The arguments of the parties on such issues followed substantially the line of the two panel opinions already summarized, with the plaintiffs relying on the jurisdictional grounds adumbrated in the panel majority opinion and with the union and its locals resting their argument on the grounds stated in the dissenting opinion.
 
 
 5
 After the en banc arguments, five members of the Court (Judges Russell, Widener, Ervin, Chapman, and Wilkinson), voted that federal jurisdiction "over plaintiffs' statutory suit against defendant union under section 8(a)(3) and for breach of the duty of fair representation was properly invoked under 28 U.S.C. Sec. 1337," but three of these five Judges (Judges Widener, Ervin, and Wilkinson) felt it unnecessary to consider whether jurisdiction also existed on constitutional grounds. Judges Russell and Chapman, the other members of the group, however, were of the opinion that jurisdiction of the cause could also be sustained on the constitutional claim. Judge Murnaghan, speaking for himself, in a separate concurring opinion, filed along with this order and opinion, found that federal jurisdiction existed in this case to decide the plaintiffs' claims as violations of the union's statutory duty of fair representation, under Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967),[2] but he agreed with the dissenting panel opinion insofar as it would deny federal jurisdiction on either the statutory or the constitutional grounds. The result is that six Judges of the Court voted to sustain federal jurisdiction over the cause, though in some instances on somewhat varying grounds.
 
 
 6
 Four members of the Court have, however, voted after the en banc hearing, (Judges Winter, Hall, Phillips, and Sprouse) to sustain the conclusions of the dissenting panel opinion that there was not federal jurisdiction herein either on statutory or constitutional grounds. The dissenting opinion did not specifically address the violation of the duty of fair representation, as alleged in the plaintiffs' complaint and as found in both the majority panel opinion and in the concurring opinion of Judge Murnaghan to be a basis for jurisdiction herein, but it is to be assumed that this ground was similarly disapproved in the dissenting opinion.
 
 
 7
 It follows that the en banc court by a vote of six to four sustained federal jurisdiction in this cause. There was apparently no difference within the Court, assuming that federal jurisdiction was upheld, that the majority panel opinion's disposition of the allocation issue was properly resolved.
 
 
 8
 Accordingly, the result of the en banc consideration is the affirmation by the en banc court of federal jurisdiction over the cause and of the majority panel's determination on the allocation issue.
 
 MURNAGHAN, Circuit Judge, concurring:
 
 9
 The posture of the case, the order of my writing and the outcome are, if not unique, at least unusual. A two-to-one majority at the panel level held unconstitutional a labor union's practice of using agency fees, received from employees who were not union members, for purposes unrelated to collective bargaining, grievance adjustment, or contract administration. Alternatively, the majority concluded that the union's conduct had violated Sec. 8(a)(3) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(3). The non-member employees were entitled to relief for that violation, in the majority's view, on two theories: first, that Sec. 8(a)(3) itself provided them with a cause of action justiciable in the federal courts, and, second, that the definition of an unfair labor practice contained in Sec. 8(a)(3) also described a breach of the duty of fair representation.[3] Judge Russell authored the majority opinion, with Judge Chapman concurring. Beck v. Communications Workers of America, 776 F.2d 1187 (4th Cir.1985).
 
 
 10
 Chief Judge Winter, in dissent, concluded that the absence of government action foreclosed the constitutional route to recovery, and that Sec. 8(a)(3), involving only controversies between employers and employees, created no restriction on a union's authority to use agency fees for non-collective-bargaining purposes. He further concluded that, in the absence of a violation of Sec. 8(a)(3), there could be no breach of the duty of fair representation, and that, in any event, the plaintiffs had no cause of action based on Sec. 8(a)(3) itself, due to the National Labor Relations Board's exclusive jurisdiction to deal with unfair labor practices under the doctrine of San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). Id. at 1214-25.
 
 
 11
 A grant of rehearing en banc, of course, eliminated the panel level decisions as grounds for disposing of the case. Back at square one, the court divided six to four. Judge Widener, Judge Ervin and Judge Wilkinson joined Judge Russell and Judge Chapman on one side of the great divide, while Judge Hall, Judge Phillips and Judge Sprouse aligned themselves with Judge Winter.
 
 
 12
 I find myself in an odd position. On the two issues addressed by my brothers, I find myself in Chief Judge Winter's camp. In my view, governmental authority cannot be ascribed to the union here, and hence there can be no constitutional violation. Nor, I believe, does Sec. 8(a)(3) in itself prohibit unions from spending agency fees for purposes unrelated to collective bargaining, grievance adjustment, or contract administration. Those arguments are fully adequate to rebut the contentions marshalled by Judge Russell. However, another set of considerations, raised by the plaintiffs[4] but not dealt with by Chief Judge Winter or by Judge Russell, has led me to the conclusion that the plaintiffs should prevail. It is one thing to be out of step with everyone but Johnny. It is even more lonely to find my vote the casting one, where that status derives from its alignment with five votes in favor of a rationale I disagree with and its opposition to four votes whose rationale, to the extent expressed, I approve.
 
 I.
 
 13
 The plaintiffs are twenty employees of the American Telephone and Telegraph Company and the Chesapeake & Potomac Telephone Company. Both employers have negotiated collective bargaining agreements with the Communications Workers of America (CWA). Both collective bargaining agreements contain an "agency shop" provision, which requires the employer to deny employment to any employee who refuses either to join the CWA or to pay the CWA agency fees equivalent to union dues. The plaintiffs are employees who are not members of the union, and who have regularly paid the required agency fees. The CWA and its locals use a part of the fees paid by the plaintiffs for purposes unrelated to collective bargaining, contract administration, or grievance adjustment.
 
 
 14
 The plaintiffs filed the present action in the United States District Court for the District of Maryland in June 1976. The plaintiffs alleged that the CWA had violated both its statutory duty of fair representation and the plaintiffs' First Amendment rights of freedom of expression by executing and enforcing the agency shop provisions in such a manner as to coerce the plaintiffs into paying fees which are not used for collective bargaining purposes. Although the union had adopted an internal procedure for the refund of the appropriate portion of dues and fees to employees who objected to such expenditures, the plaintiffs contended that the procedure was inadequate. The plaintiffs sought a declaratory judgment establishing the illegality of the exaction of fees for non-collective-bargaining purposes, an injunction against the CWA's continued use of agency fees for such purposes, and a monetary judgment for fees collected and used for such purposes in the past.
 
 
 15
 The CWA moved to dismiss the action because of the plaintiffs' failure to exhaust internal union procedures for resolving the dispute, or, in the alternative, for a stay pending such exhaustion. The district court denied the motion. Beck v. Communications Workers of America, 468 F.Supp. 87, 90-91 (D.Md.1979). The district court reasoned that deferral to the union's internal rebate procedure was not warranted where the plaintiffs alleged that the procedure itself violated their rights. The CWA does not appeal that decision.
 
 
 16
 The district court subsequently decided that the plaintiffs were entitled to the relief they sought. Addressing the question of restitution of amounts previously collected and improperly used, the court ruled that if the parties could not agree upon the sums to be refunded, the court would appoint a special master to make that determination. Beck v. Communications Workers of America, 468 F.Supp. 93, 97 (D.Md.1979).
 
 
 17
 The parties were unable to agree on the amounts to be refunded, and a master was appointed. In his first report, filed August 18, 1980, the master found that only 19% of the CWA's total expenditures were made for purposes related to collective bargaining and contract administration, and he recommended that 81% of past agency fees collected by the CWA be refunded to the plaintiffs. The CWA filed exceptions to the report. The district court remanded the matter to the master, directing the master to make specific findings in response to questions prepared by the court. Beck v. Communications Workers of America, 106 LRRM 2323 (D.Md.1981). The master filed a supplemental report in September 1981 which largely reaffirmed his earlier findings. The CWA filed exceptions to the supplemental report.
 
 
 18
 On March 5, 1982, while the district court was considering those exceptions, the union filed a motion under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim. The union contended that the plaintiffs' constitutional claim failed for lack of government action, and that the statutory claim failed because the union's conduct did not violate the duty of fair representation.
 
 
 19
 The district court apparently ignored the union's motion to dismiss, thereby effectively denying the motion. Instead, the district court granted judgment for the plaintiffs for restitution of previously paid agency fees in specified amounts. The district court also permanently enjoined the CWA and its locals from retaining from the plaintiffs in the future the portion of their agency fees certified as non-retainable by an independent certified public accountant.
 
 
 20
 On appeal, the CWA raised two claims of error. First, it argued that its motion to dismiss the complaint should have been granted. Second, it contended that, if the complaint properly stated a claim, the district court and the special master had applied an erroneous standard of proof in determining the amount of the plaintiffs' refunds. Judge Russell, joined by Judge Chapman, held that the plaintiffs had properly stated a claim for violation of both their constitutional rights and the requirements of Sec. 8(a)(3); they then went on to agree with the union that an erroneous standard of proof had been applied. The panel therefore voted to vacate some of the special master's conclusions and to remand the case for further proceedings. Beck v. Communications Workers of America, 776 F.2d 1187 (4th Cir.1985). Chief Judge Winter, in dissent, concluded that the motion to dismiss the complaint should have been granted. Id. at 1214-25.
 
 II.
 
 21
 Chief Judge Winter has, in my opinion, the better of the arguments as to whether the Communications Workers of America, in applying agency fees to non-collective-bargaining purposes, has infringed First Amendment rights of the plaintiffs or breached a statutory duty under Sec. 8(a)(3). I simply do not perceive the existence of governmental action sufficient to invoke the Constitution. Moreover, I agree with Chief Judge Winter that the courts do not have jurisdiction to consider a claim resting directly on Sec. 8(a)(3). Claims based on conduct which arguably amounts to an unfair labor practice under Sec. 8 of the National Labor Relations Act are within the exclusive jurisdiction of the National Labor Relations Board. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). While we may, of course, review the unfair labor practice determinations of the NLRB, Sec. 8(a)(3) provides no right of action that is cognizable in the first instance in the federal courts.[5]
 
 
 22
 On the other hand, federal courts plainly have jurisdiction to decide claims for violation of a union's statutory duty of fair representation. Vaca v. Sipes, 386 U.S. 171, 176-88, 87 S.Ct. 903, 909-16, 17 L.Ed.2d 842 (1967). Because that duty does not arise from the NLRA's unfair labor practice provisions, such claims were originally thought to be outside the scope of the NLRB's jurisdiction. Somewhat belatedly, the NLRB decided that a union's breach of its duty of fair representation also constitutes an unfair labor practice under Secs. 8(b)(1) and 8(b)(2). Miranda Fuel Co., 140 NLRB 181 (1962), enforcement denied, 326 F.2d 172 (2d Cir.1963). Nevertheless, in Vaca v. Sipes, supra, the Supreme Court explicitly held that the NLRB's assumption of jurisdiction did not deprive the federal courts of jurisdiction, despite the holding in San Diego Building Trades Council v. Garmon.[6] Thus, it is settled that suits for breach of the duty of fair representation, unlike claims based on Sec. 8(a)(3), are cognizable in federal courts.
 
 
 23
 Chief Judge Winter assumed, however, that the scope of the duty of fair representation, as it relates to the use of agency fees, is merely coextensive with the requirements of Sec. 8(a)(3). He therefore concluded that, in the absence of a violation of Sec. 8(a)(3), the fair representation issue was also necessarily resolved in favor of the union. It is at this point that I part company with Chief Judge Winter's analysis. The extent of the duty of fair representation is not identical to that of Sec. 8(a)(3). The two statutory obligations are quite distinct. The duty of fair representation does not arise from Sec. 8(a)(3) or from any of the NLRA's unfair labor practice provisions; rather, it is implicit in the statute as a whole. See Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 685, 97 L.Ed. 1048 (1953).[7] Conduct that amounts to an infringement of Sec. 8(a)(3) may also violate the duty of fair representation, but it does not follow that there can be no fair representation breach in the absence of a Sec. 8(a)(3) violation.
 
 
 24
 An analysis of the application of the duty of fair representation in the present case must begin with the threshold question whether the duty is implicated at all in the collection and spending of agency fees. A union's duty of fair representation extends only to the union's conduct in representing employees in dealing with their employer. Kolinske v. Lubbers, 712 F.2d 471, 481 (D.C.Cir.1983). The union must abide by that duty, for example, in negotiating a collective bargaining agreement, Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), or in adjusting an employee's grievance, Bowen v. United States Postal Service, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983); Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). On the other hand, the duty of fair representation does not apply to the union's treatment of employees within its own internal structure. Bass v. International Brotherhood of Boilermakers, 630 F.2d 1058, 1062-63 (5th Cir.1980).
 
 
 25
 The duty of fair representation, however, extends to a union's collection and use of agency fees. If dissenting employees refuse to pay the portion of their fees that is to be used for non-collective-bargaining purposes, the employer is obligated, under the terms of the agency shop clause of the collective bargaining agreement, to discharge them. The matter thus involves the union's representation of employees in dealing with the employer, thereby implicating the duty of fair representation. In particular, the collection of agency fees from employees who are not union members can hardly be characterized as a purely internal union matter, because the union would have no power to coerce the payment of fees from such employees absent the threat of action by the employer.[8]
 
 
 26
 The duty of fair representation imposes on a recognized union an obligation that is fiduciary in nature. Howard v. Aluminum Workers Int'l Union, 589 F.2d 771, 774 (4th Cir.1978); Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191, 201 (4th Cir.1963).[9] The union's exclusive bargaining status, which involves a power to act on behalf of all employees, necessarily creates a relationship of trust. The Supreme Court has explained that the relationship between a union and the employees whom it represents is governed by the "principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf." Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944). In effect, the union acts as the agent of the employees it represents, union and non-union alike. Humphrey v. Moore, 375, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964); Wallace Corp. v. Labor Board, 323 U.S. 248, 255, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944). As an agent, the union may not seek to further its own interests at the expense of a principal. Instead, the union must use the fees collected from employees only for purposes within the scope of the agency relationship.
 
 
 27
 With respect to employees who are not members of the union, the scope of the union's agency function is defined, not by mutual consent, but by law. Unlike traditional agency relationships, the association between a union and non-member employees is not shaped by the agreement of the parties, but is imposed by statute. Therefore, the scope of the union's agency function corresponds to the extent of its statutory authority to represent non-member employees. Because that authority is confined to collective bargaining, contract administration or grievance adjustment, it follows that agency fees may be used only for those purposes.[10]
 
 
 28
 It is not necessary now to decide whether the scope of the union's agency function--and hence the extent of its permissible use of employee funds--is the same with respect to union members as it is with respect to non-members. The contractual arrangements between the union and its members are not before us. Nor is it necessary to decide whether a union's use of members' dues for purposes outside the scope of its agency function should properly be remediable by the courts, or should be left to be resolved through internal union processes.[11] Those questions are not presented here, because none of the plaintiffs are union members.
 
 
 29
 My conclusion is not foreclosed by the legislative history of the Taft-Hartley Act, which is retraced in Chief Judge Winter's panel dissent. Beck v. Communications Workers of America, 776 F.2d 1187, 1215-18 (4th Cir.1985). In the first place, it should be borne in mind that the 1947 Congress' failure to enact legislation imposing limits on union spending is an instance, not of positive action, but of inaction. As the Supreme Court has pointed out, "[o]rdinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation." Bob Jones University v. United States, 461 U.S. 574, 600, 103 S.Ct. 2017, 2032, 76 L.Ed.2d 157 (1983). " 'Unsuccessful attempts at legislation are not the best of guides to legislative intent,' " id., quoting Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 382 n. 11, 89 S.Ct. 1794, 1802 n. 11, 23 L.Ed.2d 371 (1969), because, rather than indicating a clear intent, "[c]ongressional inaction frequently betokens unawareness, preoccupation, or paralysis." Zuber v. Allen, 396 U.S. 168, 185-86 n. 21, 90 S.Ct. 314, 324 n. 21, 24 L.Ed.2d 345 (1969).
 
 
 30
 Second, insofar as any congressional intent may be discerned from Congress' failure to act, the legislative history indicates merely that Congress chose not to restrict unions' expenditures of employees' funds through the use of unfair labor practice provisions. Nothing in the legislative history indicates that Congress intended to preclude the development of such restrictions by the courts under the principles of the duty of fair representation.[12] Finally, even if the legislative history of the Act may be read affirmatively to permit union expenditures of members' dues for purposes unrelated to collective bargaining--thereby foreclosing the possibility of a breach of the duty of fair representation based on such expenditures--the legislative history is altogether silent on the question of union uses of non-members' agency fees. The provisions of the House bill regulating the "reasonableness" of union exactions, which were ultimately rejected by the Conference Committee, were concerned only with members' dues, and not with fees paid by non-members. H.R. 3020, 80th Cong., 1st Sess. Secs. 7(b), 8(c)(2) (1947). The opponents of those provisions, whose view prevailed in the final version of the statute, acted on the basis of a conviction that the government should avoid the policing of internal union affairs, H.R.Rep. No. 245, 80th Cong., 1st Sess. 76 (1947) (minority views); 93 Cong.Rec. 6601 (1947) (statement of Sen. Taft)--not of matters involving outsiders to the union.[13] There is simply no indication in the legislative history that Congress intended that unions should be free from legal accountability for their collection and use of non-members' fees.[14] The legislative history, then, poses no obstacle to the view that union expenditures of agency fees collected from non-members for non-collective-bargaining purposes violates the duty of fair representation.
 
 III.
 
 31
 Because I have concluded that the plaintiffs here are entitled to the relief they seek, I must, like Judge Russell and those aligned with him, reach the union's second assignment of error--their contention that the special master and the district court applied the wrong standard of proof in determining which categories of union expenditures were permissible. On this issue, I agree that the proper standard is one of preponderance of the evidence, Ellis v. Brotherhood of Railway Clerks, 466 U.S. 435, 457 n. 15, 104 S.Ct. 1883, 1897 n. 15, 80 L.Ed.2d 428 (1984), and that all disputed factual issues should therefore be remanded for redetermination under the correct standard of proof.
 
 IV.
 
 32
 In recapitulation, it appears, on reading Judge Russell's en banc opinion, that:
 
 
 33
 1) The Court has concluded that the plaintiffs are entitled to relief, by a vote of five who find that the defendants have breached a duty imposed on them by Sec. 8(a)(3), and of one who finds no violation of Sec. 8(a)(3), but concludes that the duty of fair representation created principally by Sec. 9(a) has been infringed, as against four who deny any statutory violation.
 
 
 34
 2) The constitutional grounds asserted as a basis for recovery by the plaintiffs have received support from Judge Russell and Judge Chapman. Five members of the Court (Chief Judge Winter, Judge Hall, Judge Phillips, Judge Sprouse and I) have concluded that no such constitutional basis for relief exists. Three Court members (Judge Widener, Judge Ervin and Judge Wilkinson) have not reached the question, considering it unnecessary to do so in light of the posture of the Court on the statutory issue.
 
 
 35
 3) By a vote of six, the Court has decided that there must be remanded for a proper allocation as among permissible and impermissible expenditures chargeable to the plaintiffs such items as were not specifically determined in the panel majority opinion to be permissible or unallowable. The remaining four members of the Court have not reached the question.
 
 WINTER, Chief Judge, dissenting:
 
 36
 For the reasons set forth in the dissenting panel opinion, Beck v. Communications Workers of America, 776 F.2d 1187, 1214-25 (4 Cir.1985), I conclude that the judgment of the district court should be reversed and it should be directed to dismiss the complaint.[1] From a contrary disposition, I respectfully dissent.
 
 
 37
 Although the dissenting panel opinion sets forth what I consider to be the correct resolution of the legal issues presented by this appeal, I am constrained to comment on the separate opinion of Judge Murnaghan.
 
 
 38
 The thesis advanced by Judge Murnaghan is essentially one of his own devising. It is not one advanced by the parties and litigated by them. Although the in banc per curiam opinion now claims that the majority panel opinion rested, in part, on Judge Murnaghan's theory, the weakness of the claim is fully exposed in note 3 of what Judge Murnaghan has written. Certainly a single, obscure reference in almost twenty-five pages of text, is a fair indication that not much reliance was put on the theory.
 
 
 39
 In any event, Judge Murnaghan expresses the view that while Sec. 8(a)(3) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(3), does not prohibit unions from spending agency fees for purposes unrelated to collective bargaining, grievance adjustment, or contract administration, a union's duty of fair representation under Sec. 9(a) of the Act, 29 U.S.C. Sec. 159, prohibits such expenditures with agency fees collected from dissenting employees. Judge Murnaghan's view does not withstand close scrutiny.
 
 
 40
 The duty of fair representation is a judicial doctrine derived from the statutory duty of representatives designated or selected for the purposes of collective bargaining to "be the exclusive representatives of all of the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment...." Sec. 9(a) (emphasis added)." The doctrine was first formulated with respect to the Railway Labor Act, Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and it was extended to the National Labor Relations Act in Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). As described in Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967):
 
 
 41
 Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.
 
 
 42
 As the cases demonstrate, the doctrine is generally invoked to redress discriminations by a union on the basis of race, because of animosity toward a member of the bargaining unit, in short, because of any irrational, unequal, unfair treatment of a member of the bargaining unit. It has been held that the doctrine is inapplicable to internal union matters that do not involve the employer such as the expenditure of dues. See Price v. International Union, 795 F.2d 1128 (2 Cir., 1986).[2] It hardly seems applicable where the union's challenged expenditures were made equally on behalf of all members of the collective bargaining unit, dues paying union members and agency-fee paying nonunion members alike. Absent proof that a union acted arbitrarily, discriminatorily, or in bad faith in spending its revenues, there is no breach of the duty of fair representation even if the employer is also involved. See Price, supra.
 
 
 43
 More importantly, it would seem obvious to me that the duty of fair representation, derived from Sec. 9 of the Act, cannot be transgressed if a union does only what Congress has intentionally refrained from prohibiting it to do. As the dissenting panel opinion spells out in detail, 776 F.2d at 1215-18, Congress was fully aware of proposals to limit the use of monies collected from members of the bargaining unit for purposes not directly related to collective bargaining, grievance adjustment, etc. It took testimony protesting the expenditure of such monies for political purposes, and it considered a number of legislative proposals to prohibit or severely limit such expenditures. In the final analysis, it rejected all of the proposed restrictions and enacted legislation only limiting excessive or discriminatory initiation fees for union membership, 29 U.S.C. Sec. 158(b)(5), and prohibiting the use of monies collected in connection with federal elections, 2 U.S.C. Sec. 441(b)(3).[3] It is abundantly clear from the legislative history of these provisions that more stringent regulation was rejected as a matter of legislative judgment and not because of any thought that regulation was unnecessary because the judicial doctrine of fair representation established at the time that Congress considered the issue of regulation accomplished that result.[4] From my study of the legislative history, I think it sheer sophistry to assert that Congress decided on a course of very limited regulation only with respect to dues from union members and not also with respect to agency fees. Agency fees are the equivalent of union dues, and it is inconceivable to me that Congress specifically intended not to regulate the expenditure of union dues except in minor respects but, by mere silence, intended the expenditure of agency fees to be regulated under the judicial doctrine of the duty of fair representation.[5]
 
 
 44
 As I view it, the concurring opinion simply fails to appreciate the delicate compromise the Taft-Hartley Act managed to achieve. Congress considered the arguments of those who sought to prohibit all union security agreements, and those who wished to retain all such agreements, including the "closed shop." Senator Taft took a middle position, distinguishing between closed shops and the "union shop." Under his compromise, an employee could work at a unionized facility without acquiring membership, but only as long as he "pa[id] the same dues as other members of the union." 93 Cong.Rec. Sec. 4400 (daily ed. April 30, 1947), reprinted in 2 Legislative History of the Labor Management Relations Act, 1947, at 1142 (1948). Senator Taft explained that the bill thus prohibited the closed shop and guaranteed that a worker could "get a job without joining the union or asking favors of the union...." 2 Legislative History, supra, at 1422. Once assured of this right to work without union membership, however, Senator Taft asserted that "[t]he fact that the employee will have to pay dues to the union seems ... to be much less important." 2 Legislative History, supra, at 1422. See also id. at 1010-11, 1096-97, 1403 (remarks of Senator Taft). Thus, the compromise that became law intended to permit union security agreements requiring nonmembers to tender the same dues to the union that members regularly paid. So far as payments to the union were concerned, members and nonmembers were on a parity and treated alike. In deciding whether to disturb this legislative solution, we should be guided by the Supreme Court's reasoning in Local 1976, United Brotherhood of Carpenters and Joiners v. N.L.R.B., 357 U.S. 93, 99-100, 78 S.Ct. 1011, 1016-17, 2 L.Ed.2d 1186 (1958), deciding a secondary boycott issue:
 
 
 45
 It is relevant to recall that the Taft-Hartley Act was, to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests. This is relevant in that it counsels wariness in finding by construction a broad policy ... when, from the words of the statute itself, it is clear that those interested in just such a condemnation were unable to secure its embodiment in enacted law. The problem raised by these cases affords a striking illustration of the importance of the truism that it is the business of Congress to declare policy and not this Court's.
 
 
 46
 Thus I would conclude that when a union expends agency fees for purposes unrelated to collective bargaining, grievance adjustment, or contract administration, not otherwise specifically prohibited by the Act, such expenditures are not outlawed under the duty of fair representation.
 
 
 47
 Judges HALL, PHILLIPS and SPROUSE authorize me to say that they concur in these views.
 
 
 
 [1]
 The majority opinion, in note 26 on page 1204, also opined that federal jurisdiction might also be found "under Sec. 301 of the Taft-Hartley Act, 29 U.S.C. Sec. 185."
 
 
 [2]
 It is inaccurate to state that the majority opinion did not find jurisdiction on the violation of the duty of fair representation by the union. The majority panel opinion did assert such jurisdiction but it did not assert it with the same depth of reasoning and perception as does Judge Murnaghan's concurring opinion
 
 
 [3]
 The extent to which the panel majority relied on the duty of fair representation is unclear. On the one hand, the opinion states that "plaintiffs have stated a good cause of action for a violation of ... the duty of fair representation" as well as for a violation of Sec. 8(a)(3). 776 F.2d 1187, 1196. Moreover, the majority plainly concluded that it was the fair representation claim that brought the statutory aspect of the case within this court's jurisdiction, rather than within the exclusive jurisdiction of the NLRB. Id. at 1203-04. On the other hand, the majority's rationale for its holding on the statutory issue is explained exclusively in terms of Sec. 8(a)(3) and its relationship to Sec. 2, Eleventh of the Railway Labor Act, with no consideration given to the independent force of the duty of fair representation. In addition, the opinion states that "[o]nly if jurisdiction of these claims under Sec. 8(a)(3) itself is nonexistent would a dismissal of this action ... be appropriate." Id. at 1196 (emphasis supplied). These somewhat contradictory indications are reconciled, it seems to me, if the opinion is read to hold that a breach of the duty of fair representation follows automatically from a violation of Sec. 8(a)(3). If I have misread Judge Russell, I solicit his indulgence
 
 
 [4]
 In his dissenting opinion at the en banc level, Chief Judge Winter argues that the issue of the duty of fair representation was neither advanced by the parties nor considered by the panel majority. Post, at 1290. It is true that, in the briefs and oral arguments, the duty of fair representation was overshadowed by the parties' emphasis on Sec. 8(a)(3). However, that seems to have occurred because the parties, like the panel majority, believed that Sec. 8(a)(3) provided a sort of "standard of care" for the duty of fair representation, and not because they believed that the plaintiffs' claim rested on Sec. 8(a)(3) alone. A review of the record reveals the inaccuracy of the suggestion that the fair representation issue is of my own devising
 The duty of fair representation was initially raised as a ground for relief in the plaintiffs' complaint. Supplemental Appendix 15. Moreover, it is noteworthy that, although the issue was raised separately, the complaint also charged that the union's expenditure of agency fees violated its fiduciary duty to all bargaining unit employees. Id. at 12-15. The plaintiffs' failure, at that stage, to perceive a connection between their claims surely does not prevent this court from doing so.
 The question of the duty of fair representation was raised again in the briefs submitted in connection with the initial hearing on appeal before a panel of this court. The defendants pointed out that because claims based directly on Sec. 8(a)(3) are within the exclusive jurisdiction of the National Labor Relations Board, the plaintiffs would have to find an alternative basis for their statutory claim if they wished this court to consider it. Reply Brief of Appellants/Cross-Appellees 9-10. The plaintiffs responded with the argument that the statutory basis for their claim actually lay in the implied duty of fair representation. Appellees' Supplemental Brief 2-3. Although the plaintiffs did not clarify their view of the relationship between the basis of their claim in the duty of fair representation and their arguments under Sec. 8(a)(3), the only reasonable interpretation of their position seems to be that they believed that Sec. 8(a)(3) provided a convenient standard by which the presence or absence of a breach of the duty of fair representation could be tested.
 Finally, the panel majority's opinion clearly considered and agreed with the plaintiffs' arguments concerning the fair representation issue. A close reading of that opinion reveals that the panel majority believed that the plaintiffs had two alternative statutory claims, one based directly on Sec. 8(a)(3), the other based on the duty of fair representation. The panel majority concluded that the union's expenditure of agency fees was "not only a violation of the statute itself but also a violation of the duty of fair representation." 776 F.2d at 1203. The majority then explained, in an extensive discussion, that the presence of the fair representation claim provided the court with jurisdiction and defeated the argument that exclusive jurisdiction lay with the NLRB. Id. at 1203-04.
 
 
 [5]
 No similar jurisdictional problem exists with respect to the analogous provision of the Railway Labor Act, Sec. 2, Eleventh, relied on by Judge Russell, which also authorizes the adoption of union shop and agency shop agreements. Unlike Sec. 8(a)(3), Sec. 2, Eleventh is not subject to the jurisdiction of an administrative board. Indeed, there is no administrative board under the RLA whose functions parallel those of the NLRB
 
 
 [6]
 The Court explained that:
 [A] primary justification for the pre-emption doctrine [announced in Garmon]--the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose--is not applicable to cases involving alleged breaches of the union's duty of fair representation.... [A]s these matters are not normally within the Board's unfair labor practice jurisdiction, it can be doubted whether the Board brings substantially greater expertise to bear on these problems than do the courts,.... Nor do we think that Congress intended to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements.
 Vaca v. Sipes, 386 U.S. at 180-81, 186, 87 S.Ct. at 911-12, 914.
 
 
 [7]
 Insofar as the statutory source of the duty may be more precisely located, it is to be found in Sec. 9(a) of the Act, which grants to recognized unions the privilege of acting as the exclusive bargaining representative of all employees. Kolinske v. Lubbers, 712 F.2d 471, 481 (D.C.Cir.1983); Local Union No. 12, United Rubber Workers v. N.L.R.B., 368 F.2d 12, 17 (5th Cir.1966); Price v. United Auto Workers, 621 F.Supp. 1243, 1250 (D.Conn.1985). That privilege carries with it the duty to represent all employees fairly. Humphrey v. Moore, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964); Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 200-04, 65 S.Ct. 226, 231-33, 89 L.Ed. 173 (1944)
 
 
 [8]
 The issue here is thus very different from that presented in Kolinske v. Lubbers, 712 F.2d 471 (D.C.Cir.1983), which held that the duty of fair representation was not implicated in a union's unilateral decision not to distribute strike benefits to non-union employees who honored a picket line but failed to participate in various strike activities. The union's refusal to pay strike benefits to a non-member who refused to participate in strike activities was properly characterized as an internal union matter because the authority to make and enforce that decision lay solely with the union, and did not depend on, and indeed could hardly count on, the cooperation of the employer
 
 
 [9]
 Accord, N.L.R.B. v. Local 282, Int'l Brotherhood of Teamsters, 740 F.2d 141, 147 (2d Cir.1984); Deboles v. Trans World Airlines, 552 F.2d 1005, 1014 (3d Cir.1977); Waiters Union, Local 781 v. Hotel Ass'n, 498 F.2d 998, 1000 (D.C.Cir.1974); Local Union No. 12, United Rubber Workers v. N.L.R.B., 368 F.2d 12, 17 (5th Cir.1966)
 
 
 [10]
 Of course, it is possible that non-member employees might voluntarily choose collaterally to extend the statutory right of representation, and thereby contractually to use the union as their agent for some purpose unrelated to collective bargaining. To that extent, the scope of the union's agency function would be defined by mutual consent, and could be treated under traditional principles of contract law and agency law. Amounts spent by the union pursuant to such express authorization by non-member employees would not involve a breach of the duty of fair representation
 Here, however, there is no indication of mutual consent extending the union's authority beyond that spelled out by statute.
 
 
 [11]
 Chief Judge Winter asserts, post at 1292, that "[a]gency fees are the equivalent of union dues," and that for the purposes of regulating union expenditures members and non-members should be treated alike. That view overlooks an important distinction between members and nonmembers: members have the right to vote in union elections. By exercising their right to vote, union members can indirectly control the union's spending decisions. Nonmembers, who do not have a right to vote, lack any power over union policymaking and must trust in the good faith of union officials in protecting their interests. The union member's voting power might or might not justify a determination that the relationship between a union and its members is not sufficiently fiduciary to warrant judicial intervention with respect to expenditures of dues for non-collective bargaining purposes; that question is not before us here. What is clear, however, is that the non-union member, who lacks any means of imposing limits on the freedom of union officials to deal with his compulsory contributions, is in a situation quite different from that of the union member and of the kind that traditionally calls for judicial protection
 
 
 [12]
 Congress was aware, at the time of the enactment of the Taft-Hartley Act in 1947, of the judicial implication of the duty of fair representation under the federal labor statutes. The duty had first been recognized three years earlier in Steele v. Louisville & Nashville R.R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)
 
 
 [13]
 Congress later overcame many of its objections to governmental intrusion into internal union affairs with the passage of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. Sec. 401 et seq., which established a "bill of rights" for union members against their union leadership
 
 
 [14]
 Chief Judge Winter argues, post at 1292-1293, that Congress in 1947 consciously adopted a "hands off" approach to unions' expenditures of agency fees. In my view, that inference is simply too tenuous to be accepted. None of the evidence pointed to by Judge Winter provides any real support for that conclusion. On the contrary, both Sec. 8(d)(4) of the original House bill, reprinted in 2 Legislative History of the Labor Management Relations Act 56-58 (1948), which was a precursor of the present proviso to Sec. 8(a)(3), and the remarks of Senator Taft in the Senate debates, 93 Cong.Rec. Sec. 4400 (April 30, 1947), reprinted in 2 Legislative History of the Labor Management Relations Act 1142 (1948), indicate that their authors were focusing on the question of union membership
 It is true that both the drafters of the House bill and Senator Taft endorsed the union shop, but the union shop is not the same as the agency shop. Both differ from the closed shop in that the employer is not obligated to hire employees only from among persons who are already union members. However, under a union shop arrangement, new employees must become, or at least seek to become, union members within a brief period after their employment commences. While the union may deny them membership, they cannot choose to remain nonmembers. In an agency shop, on the other hand, membership in the union is entirely optional. Judge Winter has pointed to nothing in the legislative history that suggests that Congress consciously focused on the latter kind of arrangement. The portions of the House bill and the Senate debates cited by the dissent reveal a concern for the would-be union member who is denied membership in a union shop arrangement, but they have no bearing on agency shops or agency fees.
 No discussion of Congress' intent in the Taft-Hartley Act with respect to agency shop arrangements can ignore the Supreme Court's decision in NLRB v. General Motors, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). There, the Court held that the proviso to Sec. 8(a)(3), which exempted union shop arrangements from prohibition as an unfair labor practice due to their discriminatory nature, also extended to agency shop agreements. The Court's decision was undoubtedly correct, but it was not based on a perception that Congress consciously considered the problem of agency shops in 1947. Rather, implicitly acknowledging the lack of evidence of any such conscious consideration, the Court looked to the interpretation that would be most consistent with "the desire of Congress to reduce the evils of compulsory unionism while allowing financial support for the bargaining agent." Id. at 744, 83 S.Ct. at 1460. While that broad congressional purpose can easily support the conclusion drawn from it in General Motors, it simply cannot, without severe logical strain, be made the basis of an inference that Congress considered and rejected the possibility of any restrictions on unions' expenditures of agency fees. Indeed, if anything, it cuts the other way: imposing fiduciary responsibilities on unions with respect to agency fee expenditures would tend to reduce the burdens of compulsory unionism for the non-member employee, while at the same time guaranteeing the union financial support for its collective bargaining activities.
 
 
 [1]
 The dissenting panel opinion spoke to the issues of state action and the duty of a union under Sec. 8(a)(3) of the National Labor Relations Act because the panel majority based its judgment on both. The in banc majority has declined to consider the issue of state action. It is interesting to note, however, that the Second Circuit in Price v. International Union, 795 F.2d 1128 (1986), has emphatically rejected the view of the panel majority on the state action issue
 
 
 [2]
 Price also points out that suit for breach of the duty of fair representation will ordinarily not be entertained until there has been an exhaustion of internal union remedies. Whether there was exhaustion of any available remedies in this case is far from clear. Perhaps non-exhaustion was the reason why the parties did not advance the argument constructed by Judge Murnaghan
 
 
 [3]
 Plaintiffs make no claim that either of these restrictions was violated
 
 
 [4]
 It is disingenuous to assert that the members of Congress who vigorously debated the union security provision of Sec. 8(a)(3) were aware that regardless of their legislative compromise, the judiciary remained free to imply additional limitations under the duty of fair representation. See ante at 1288 & n. 11 (Murnaghan, J., concurring). It is true that the Supreme Court first recognized that duty in Steele v. Louisville & Nashville R.R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) three years before Congress enacted the Taft-Hartley Act. But Steele merely held that under the Railway Labor Act, a union could not refuse to represent black employees in the collective bargaining process because it had a "duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." Id. at 203, 65 S.Ct. at 232. Unlike the present case where Judge Murnaghan implies from the Act a limitation that Congress rejected, the Steele court could fairly state that a duty to represent all the workers of a unit in collective bargaining with the employer "expresse[d] the aim of Congress." Id. at 202, 65 S.Ct. at 232. Three years later when Congress decided as a matter of national labor policy to reject proposed limitations on union dues, it is untenable to think that it was "aware" that the Steele decision might serve to accomplish the same thing. It is a testament to the unforeseeability of this reading of Steele that no other court has so expanded the duty of fair representation for nearly forty years
 
 
 [5]
 Judge Murnaghan argues, ante at 1288, that the legislative history only shows that Congress rejected limits on union expenditures of members' dues, leaving open the possible regulation of nonmembers' agency fees. It is true that the provisions of the House bill limiting initiation fees and dues to "reasonable" amounts expressly applied only to "members." H.R. 3020, 80th Cong., 1st Sess. Secs. 7(b), 8(c)(2) (1947); see Beck, 776 F.2d at 1216 (Winter, C.J., dissenting). But the union security agreement provision of that bill, Sec. 8(d)(4), much like the present Sec. 8(a)(3), would have made it an unfair labor practice for the employer to deny employment to individuals whose membership was denied despite their "tender[ing] to the [labor] organization the initiation fees and dues regularly imposed as a condition of membership therein...." Nonmembers had a right to work under this bill if they tendered the dues "regularly imposed" on members, and, thus, through Sec. 8(d)(4) the reasonableness limitations would have applied to agency fees. In rejecting this bill, Congress rejected the regulation of fee collection from members and nonmembers for reasons applicable to both. The House Minority Report criticized the bill's attempt to monitor union fees as an undue regulation of unions' internal affairs that, as a practical matter, was unenforceable because of "the infinite details involved in the internal functioning of thousands of trade-unions having millions of members." H.R.Rep. No. 245, 80th Cong., 1st Sess. 76 (1947) (Minority Report); see Beck, 776 F.2d at 1216 (Winter, C.J., dissenting). As the dissenting panel opinion notes, the proceedings of this one case, requiring over nine years, over 4,000 pages of testimony, over 3,000 documents, two district judges and a special master, "exemplify precisely the situation that Congress decided to avoid in defeating the amendment to supervise union dues collection." Beck, 776 F.2d at 1218 (Winter, C.J., dissenting). The result is identical, and equally offensive to Congressional intent, whether accomplished through the interpretation of Sec. 8(a)(3), or the expansion of the duty of fair representation