**Kathryn A. KIDWELL, et al.**

v.

**TRANSPORTATION COMMUNICATIONS INTERNATIONAL UNION, et al.**

**Civ. No. PN–85–3804.**

United States District Court, D. Maryland.

Feb. 27, 1990.

**194**

Milton L. Chappell, Silver Spring, Md., and Hugh L. Reilly, Nat. Right to Work Legal Defense Foundation, Springfield, Va., for plaintiffs.

Edgar N. James, John J. Sullivan and Michael G. Dzialo, Guerrieri, Edmond & James, Washington, D.C., and Mitchell M. Kraus, Gen. Counsel, Transp. Communications Intern. Union, Rockville, Md., for defendants.

## OPINION

NIEMEYER, District Judge.

The four plaintiffs, who are or have been railroad employees and who purport to represent others similarly situated, have sued the Transportation Communications International Union and two of its locals (collectively "the TCU" or "the Union"), complaining about the Union's expenditure of dues for purposes unrelated to collective bargaining and its method of reducing dues to nonunion employees. The TCU is the collective bargaining representative under an agency shop relationship authorized by the Railway Labor Act, which permits railroad employees to be union members or not, but requires that all employees pay for the costs of collective bargaining. 45 U.S.C. § 152, Eleventh.

One plaintiff, Kathryn Kidwell, is a member of the Union and has objected on First Amendment grounds to the Union's expenditure of her dues on expenses unrelated to collective bargaining. The other three plaintiffs, Michael Coffman, Helen Eades, and Ramona Ellis, are not members of the Union, although Eades was a union member until she retired in 1988. All plaintiffs challenge the methods used by the Union to account for and return dues that are attributable to expenditures unrelated to collective bargaining.

The parties have filed cross motions for summary judgment based on the record developed by discovery and have thoroughly re-briefed the issues in the light of Supreme Court cases that were decided since this action was filed.

For the reasons that are given hereafter, the Court concludes that the Union's use of Kidwell's dues over her objection for political or ideological purposes improperly infringes on her statutory and First Amendment rights. Her objection to the use of dues for other purposes unrelated to collective bargaining must be sustained as contrary to the Railway Labor Act. The remaining claims of the nonunion plaintiffs, challenging the method by which the Union accounts to them for expenditures unrelated to collective bargaining costs, are rejected seriatim on the merits or as moot.

## I. UNION–MEMBER DEMANDS FOR DUES REDUCTION

■ Kidwell, who is a member of the TCU, objects to having her union dues used for any purpose unrelated to collective bargaining. She demands the same reduction in dues that is afforded to nonunion employees of the railroad who object to the expenditure of dues by the Union for political causes. She works under a collective bargaining agreement negotiated between her employer, the National Railroad Passenger Corporation, and her bargaining representative, the Conrail System Board of Adjustment No. 86 of the TCU. This agreement provides for an agency shop,

which is a variation of the union shop arrangement permitted by the Railway Labor Act. Under an agency shop arrangement, all employees are required, as a condition of employment, to pay an initiation fee and dues to the union, but they need not actually become union members.

For the years 1985–88, Kidwell objected to the use of her money for purposes other than collective bargaining, and the TCU granted her a reduction on the same basis as was granted to nonunion members. In 1989, however, the TCU modified its constitution to prohibit the reduction to union members. With the change, an employee can object only if he or she gives up union membership.

Kidwell is unwilling to resign from the Union and continues to object to its use of her dues for purposes unrelated to collective bargaining. She contends that she is illegally presented with a dilemma. On the one hand, she can join the Union and be required to support political causes to which she is opposed, and on the other, she can withdraw from the Union to preserve her First Amendment rights, but forego the rights of union members to participate in shaping the terms and conditions of her employment. *Cf.* Comment, *The Regulation of Union Political Activity: Majority and Minority Rights and Remedies,* 126 U.Pa.L.Rev. 386, 419–20 (1977) (discussing analogous situation under the NLRA).

In 1951 Congress amended the Railway Labor Act to add § 2, Eleventh, which authorizes a union shop. 45 U.S.C. § 152, Eleventh. That provision provides in essential part that a labor organization authorized to represent employees is permitted "to make agreements, requiring, as a condition of continued employment that ... all employees shall become members of the labor organization representing their craft or class." This authorization is subject to the requirement that union membership not be discriminatory and that termination not be permitted except for "the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership." 45 U.S.C. § 152, Eleventh(a).

Confronted with the constitutionality of this union shop provision in *Railway Employes' Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), the Supreme Court acknowledged that the adoption by Congress of an act that establishes exclusive representation of employees in a craft or class by a single union and that permits the union to enter into an agreement for a union shop is governmental action which would be restricted by the First Amendment. The Court stated:

> If private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded. In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed. The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction.

*Id.* at 232, 76 S.Ct. at 1798 (citations omitted). *See also Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 226, 97 S.Ct. 1782, 1794, 52 L.Ed.2d 261 (1977) (RLA authorization of union shop is governmental action); *International Ass'n of Machinists v. Street,* 367 U.S. 740, 760, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961) (Congress gave unions a role in effecting congressional policy).

Addressing the argument on the merits that a union shop agreement forces members into ideological and political associations that violate the Bill of Rights, the Court in *Hanson* concluded that it was within the power of Congress, in the exercise of its right to regulate commerce, to permit a union shop "as a stabilizing force." *Hanson,* 351 U.S. at 233, 76 S.Ct. at 1798. The Court noted that the Railway Labor Act, as amended in 1951, permissibly requires beneficiaries of trade unionism to contribute to the costs of collective bargaining. *Id.* at 233–35, 76 S.Ct. at 1798–99. "No more has been attempted here." *Id.* at 235, 76 S.Ct. at 1799. On that narrow

basis, the Court in *Hanson* rejected the constitutional challenge. If, however, an employee had been required to contribute to costs beyond those related to collective bargaining, the result could well have been different. This issue was expressly left open by the Court.

The financial support required relates, therefore, to the work of the union in the realm of collective bargaining. No more precise allocation of union overhead to individual members seems to us to be necessary. The prohibition of "fines and penalties" precludes the imposition of financial burdens for disciplinary purposes. *If "assessments" are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented.*

*Id.* (emphasis added) (footnote omitted).

The problem left open in *Hanson* was squarely presented in *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), where employees of a railroad, who were represented by a machinist union by virtue of a union shop agreement entered into under the authority of the Railway Labor Act, objected to the use by the union of fees to finance campaigns of candidates for public office to whom the employees were opposed. Recognizing that the record in *Street* was fully adequate to test the constitutional question left open by *Hanson,* the Court nevertheless did not reach the constitutional issue. Rather, by relying on the legislative history of the Railway Labor Act, the Court concluded that the Act itself did not authorize the expenditures by the unions of monies on political causes because they were unrelated to collective bargaining.

The conclusion to which this history [of the Railway Labor Act] clearly points is that § 2, Eleventh contemplated compulsory unionism to force employees to share the costs of negotiating and administering collective bargaining agreements, and the costs of the adjustment and settlement of disputes. One looks in vain for any suggestion that Congress also meant in § 2, Eleventh, to provide the unions with a means for forcing employees, over their objection, to support political causes which they oppose.

*Id.* at 763–64, 81 S.Ct. at 1797 (footnote omitted). Although the statute does not explicitly prohibit the expenditure by unions of expenses to support political causes, the Court concluded that that was clearly the intent of Congress. The Court did not hold that unions could not engage in political action, but more narrowly, that it could not spend the "exacted money" of a dissenting employee. As the Court summarized:

Our construction therefore involves no curtailment of the traditional political activities of the railroad unions. It means only that those unions must not support those activities, against the expressed wishes of a dissenting employee, with his exacted money.

*Id.* at 770, 81 S.Ct. at 1800. Mr. Justice Black, observing that the majority opinion carried the doctrine of avoiding constitutional questions "to a wholly unjustifiable extreme," *id.* at 784, 81 S.Ct. at 1807, dissented. He noted that the Railway Labor Act, by not expressly restricting the expenditures of the union, permitted the statute to be applied in violation of the First Amendment. He concluded that Section 2, Eleventh of the Railway Labor Act violated the First Amendment. *Id.* at 791, 81 S.Ct. at 1810.

Without taking the analysis any further, the *Street* case disposes of the issue raised by Kidwell in this case on the basis of statutory interpretation. The Court held that the Railway Labor Act, by not authorizing a union to use dues to support political causes, was by inference prohibiting it from doing so over the objection of employees without regard to their status as members of the union. If, however, the Railway Labor Act were to be construed on the basis of its plain statutory language, no prohibition could be discerned to preclude union expenditures for purposes that were properly voted on by a majority of the union. This would permit the expenditure of Kidwell's money to support political or ideological activity over which she objected and would render the statute in violation of

the First Amendment. In *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Court seemed to reach these conclusions that it refused to draw in *Street*. It rested its prohibition against the union expenditures on political causes, not on the implied prohibitions of the provisions of the state statutes that were comparable to the Railway Labor Act, but on the First Amendment.

In response to the employees' argument in *Abood* that they could constitutionally prevent union expenditures of their required service fees on ideological causes, the Court agreed "this argument is a meritorious one." 431 U.S. at 234, 97 S.Ct. at 1799. The Court held:

> We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, *the Constitution requires* only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.

*Id.* at 235–36, 97 S.Ct. at 1799–1800 (emphasis added) (footnote omitted). Echoing this position in *Hudson*, the Court seemed to limit its statements in *Abood* to *nonunion* employees:

> We also held [in *Abood*], however, that nonunion employees do have a constitutional right to "prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." *Id.* at 234 [97 S.Ct. at 1799.]

475 U.S. at 301–02, 106 S.Ct. at 1073.

The TCU argues that the compulsion giving rise to a First Amendment violation is absent here because of the provisions of the agency shop agreement which permit Kidwell to withdraw from the union without losing her job. The TCU thus argues that a distinction can be made between union members and nonunion members in the agency shop context.

An agency shop is a form of union shop in the sense that all employees are required as a condition of employment to pay an initiation fee and dues to the union. But it varies from a pure union shop in the sense that all employees need not actually become union members. In *NLRB v. General Motors Corp.*, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), the Supreme Court determined, under comparable union shop provisions of the Labor Management Relations (Taft–Hartley) Act, 29 U.S.C. § 158(a)(3), that a company could not refuse to negotiate an agency shop arrangement because the essential purpose of the union shop to require all employees to pay for the benefits of unionism is satisfied by an agency shop arrangement.

> The agency shop arrangement proposed here removes that choice from the union and places the option of membership in the employee while still requiring the same monetary support as does the union shop. Such a difference between the union and agency shop may be of great importance in some contexts, but for present purposes it is more formal than real. To the extent that it has any significance at all it serves, rather than violates, the desire of Congress to reduce the evils of compulsory unionism while allowing financial support for the bargaining agent.

*Id.* at 744, 83 S.Ct. at 1460. The Court, however, did not address the consequence of an agency shop agreement which denies to the nonunion employee the right to vote on conditions of employment negotiated for that employee by the union.

The TCU argues that an employee in an agency shop has the choice of participating voluntarily as a union member. As a union member the employee has the right to vote for or against a political cause proposed by the union. If the employee does not wish to expose his or her dues to that democratic process, the employee may withdraw

without losing employment. As Justice Black noted in his dissent in *Street*, "[t]here is, of course, no constitutional reason why a union or other private group may not spend its funds for political or ideological causes if its members voluntarily join it and can voluntarily get out of it." 367 U.S. at 788, 81 S.Ct. at 1809 (Black, J., dissenting). The TCU thus urges that if Kidwell does not subscribe to the causes for which her dues are applied, she can, under the agency shop arrangement, withdraw from the union so long as she continues to pay the expenses allocated solely to collective bargaining. She does not lose her job and she reaps the benefits of collective bargaining by the Union.

At first blush, the argument is attractive in that membership in the politically oriented organization is voluntary and therefore not compelled. *See, e.g., DeMille v. American Fed'n of Radio Artists*, 31 Cal.2d 139, 187 P.2d 769 (1947), *cert. denied*, 333 U.S. 876, 68 S.Ct. 906, 92 L.Ed. 1152 (1948); L. Tribe, American Constitutional Law 805 n. 5 (2d ed. 1988). But this argument fails to treat fairly and legally the circumstances of Kidwell, who wants to participate in the collective bargaining process, which is delegated exclusively to the union, but who objects to supporting its political causes.

If Kidwell wishes to participate in the collective bargaining process, her money is utilized over her objection to support political causes to which she is opposed. If she withdraws from the union, the only avenue allowed to her for protecting her First Amendment rights, she is compelled to give up participation in the collective bargaining process. This is not a hollow privilege. She can no longer vote on the representatives who are given the exclusive right to negotiate her terms of employment; she can no longer participate in the resolution of disputes over conditions of employment; and perhaps most significantly, she cannot vote on the terms and conditions of employment that the Union representatives negotiate and to which she will be subjected. Without her input or vote she can be subjected to reductions in income, longer hours, rejection of an agreement which she personally approves, or even a strike.

While she might not be bound by the strike, if one were voted, it could have the residual effect of putting her out of a job. In short, at the risk of stating the choice too simplistically, she is given the option of protecting free speech or of protecting her vote on the continuation or conditions of work, but not both. The importance of the conflicting rights forces a choice not significantly more tolerable than the choice between conflicting constitutional rights. *Cf. Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968) (intolerable to force criminal defendant to choose between Fourth and Fifth Amendment rights).

■ The compulsion of yielding interests so significant as the right to participate and the right to vote on one's conditions or continuation of employment is a burden that cannot be imposed on the exercise of First Amendment rights. Trade-unionism through a government imposed union shop, *even when limited to the collective bargaining function*, impinges on freedoms of association and speech, but these infringements are considered an acceptable balance for the industrial peace and economic stability that are achieved by the Railway Labor Act.

To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative.... To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress.

*Abood*, 431 U.S. at 222, 97 S.Ct. at 1792 (footnote omitted). And again in *Ellis v.*

*Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), the Court noted yet more directly,

> by allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights. The dissenting employee is forced to support financially an organization with whose principles and demands he may disagree.... It has long been settled that such interference with First Amendment rights is justified by the governmental interest in industrial peace.

*Id.* at 455–56, 104 S.Ct. at 1895–96. The infringements discussed by the Court in *Abood* and *Ellis* of necessity are bound up in the concepts of collective bargaining. When the union, however, strays from that charter given by the Railway Labor Act, *see Street,* 367 U.S. at 764, 81 S.Ct. at 1797, and uses dues to support candidates, religious beliefs, or any other ideological cause, it is not an answer to say to one who is opposed to those views, "leave the union." The union is the only vehicle through which the employee can participate in the terms of his or her employment. This Court concludes that in the context of governmental action that is imposed by the Railway Labor Act, the restriction on First Amendment freedoms must be drawn as narrowly as is consistent with the Congressional purpose in enacting the Railway Labor Act. As the Supreme Court in *Street* noted:

> One looks in vain for any suggestion that Congress also meant in § 2, Eleventh to provide the unions with a means for forcing employees, over their objection, to support political causes which they oppose.

*Id.* Nothing would preclude the union from pursuing political activity, so long as it afforded to those who opposed a reduction in dues without a diminishment of the right to participate in the collective bargaining process.

This result is compelled, whether it rests on the First Amendment, as discussed in *Abood* and *Hudson,* or on the statutory interpretation made in *Street.* Nowhere in *Street* did the Court indicate that union employees could be treated differently from nonunion employees with respect to exercising the right to object to the expenditure of exacted dues on political causes. Rather, the holding applies to *all* employees. *See* 367 U.S. at 768–69, 81 S.Ct. at 1799–1800. Moreover, the explicit provisions of the Railway Labor Act permit no such distinction.

Accordingly, the Court will require that Kidwell be given the right to a reduction of her dues to the extent they are expended for ideological causes to which she is opposed. Furthermore, under the holding of *Railway Clerks v. Allen,* 373 U.S. 113, 121–22, 83 S.Ct. 1158, 1163, 10 L.Ed.2d 235 (1963), and *Abood, supra,* she is also entitled to a reduction attributable to all union expenses unrelated to collective bargaining. *Allen,* 373 U.S. at 121, 122, 83 S.Ct. at 1163. *See also Ellis,* 466 U.S. at 447, 104 S.Ct. at 1891 (discussing *Allen* and *Abood*).

## II. DUES REDUCTION PROCEDURES

As already observed, although a union shop or agency shop agreement requires *every* employee to pay dues for the costs of collective bargaining, Section 2, Eleventh of the Railway Labor Act does not authorize a union to spend the money of employees for other purposes over their objection. *Ellis,* 466 U.S. at 446–47, 104 S.Ct. at 1891; *Allen,* 373 U.S. at 121–22, 83 S.Ct. at 1163; *Street,* 367 U.S. at 768–69, 81 S.Ct. at 1799–1800. In *Ellis* the Supreme Court fine-tuned the criteria for determining those expenditures that may be imposed. Beginning with the general principle that the union can collect dues to pay for expenses "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues," 466 U.S. at 448, 104 S.Ct. at 1892, the Court approved union assessments for expenses incurred for conventions, social activities, publications (in part), and litigation (in part) and disapproved union organizing expenses. *Id.* at 448–51, 104 S.Ct. at 1892–93. The Court also held that because First Amendment rights are implicated a "pure rebate ap-

proach," by which the employee who paid full dues and later is paid a rebate for expenses unrelated to collective bargaining issues, is "inadequate." *Id.* at 443, 104 S.Ct. at 1889. The Court explained that "the union cannot be allowed to commit dissenters' funds to improper uses *even temporarily.*" *Id.* at 444, 104 S.Ct. at 1890 (emphasis added).

█ In May 1986, after this case was instituted, the Supreme Court announced its decision in *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), which prescribed procedural safeguards that must be followed in reducing the dues of objecting employees. The Court ruled that the union must afford the employee the opportunity to participate in and object to the union's allocation of dues by (1) providing the employee advance information about the fee to be charged, (2) affording him a reasonably prompt opportunity to challenge the union's proposed fee before an impartial decision maker, and (3) retaining the disputed amount in an escrow account pending the decision by the impartial decision maker. *Id.* at 310, 106 S.Ct. at 1077.

Against the principles established by *Ellis* and *Hudson,* the plaintiffs challenge the procedures that were followed by the TCU before *Hudson* and the procedures that were adopted by the TCU since the filing of the complaint after the decision in *Hudson.* Because *Hudson* was decided after this suit was filed, the circumstances and positions of the parties have been shifting, requiring the Court to focus on what has been, essentially, a moving target.

As a general response to plaintiffs' challenges, the Union objects to the application of the standards established by *Hudson* to procedures that were in effect before *Hudson* was decided. It contends that this improperly applies the teachings of *Hudson* retroactively, citing *Lowary v. Lexington Local Bd. of Educ.,* 704 F.Supp. 1476 (N.D. Ohio 1988).

Cases are ordinarily decided in accordance with the law existing at the time of the decision, *see, e.g., Goodman v. Lukens Steel Co.,* 482 U.S. 656, 662, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987). In a limited set of circumstances, however, the retroactive application of a case, which the general principle embraces, is not appropriate. The Supreme Court explained in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), that three factors should be considered in determining whether its decisions should not be applied retroactively: (1) whether the decision establishes a new principle of law, "either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression, whose resolution was not clearly foreshadowed;" (2) whether retroactive application furthers or retards the operation of the principle of law that is announced in the decision; and (3) whether retroactivity imposes inequity that would result in substantial injustice or hardship. *Id.* at 106–07, 92 S.Ct. at 355 (citations omitted). Thus, the need for imposing the principles established by the decision must be balanced against the surprise and hardship that retroactive application would effect.

Turning to *Hudson,* the decision neither overruled past precedent nor decided an issue of first impression "whose resolution was not clearly foreshadowed." *Chevron Oil,* 404 U.S. at 106, 92 S.Ct. at 355. The basic procedures explained in *Hudson* are that the union must provide to the employees an adequate explanation of the dues reduction prior to the time in which an objection may be filed; the employees must have an opportunity to challenge the fee calculation before an impartial decision maker; and an escrow account must be established to hold amounts reasonably in dispute pending a decision by the impartial decision maker. *Hudson,* 475 U.S. at 310, 106 S.Ct. at 1077. None of these procedural requirements are so radical that they can be said to be unforeseen. This is particularly compelling when considering that *Ellis,* which was decided in 1984 before this action was filed, ruled that the union cannot be allowed "to commit dissenters' funds to improper uses *even temporarily,*" 466 U.S. at 444, 104 S.Ct. at 1890 (emphasis added), because acceptable alternatives,

such as the *advance reduction* of dues, could be implemented. The procedural requirements of *Hudson* merely describe measures that are necessary to protect the constitutional and statutory rights of employees that were announced earlier in *Street, Abood,* and *Ellis.* All of these cases were decided before suit was filed in the instant case.

Moreover, any time First Amendment rights are at issue, one should expect that stringent guidelines will be established to protect those rights. The Supreme Court emphasized in *Abood* the importance of the First Amendment rights "by quoting the comments of Thomas Jefferson and James Madison about the tyrannical character of forcing an individual to contribute even 'three pence' for the 'propagation of opinions which he disbelieves.'" *Hudson,* 475 U.S. at 305, 106 S.Ct. at 1075 (*citing Abood,* 431 U.S. at 234–35, n. 31, 97 S.Ct. at 1799, n. 31).

The second and third factors listed in *Chevron Oil* for consideration do not, when applied here, suggest that *Hudson* should not be retroactively applied. The principles of *Hudson* are procedural, but they are important procedures to give effect to a line of decisions that reach back to *Street,* decided over 28 years ago. Their application does not work a hardship that could not have been reasonably foreseen.

Consequently, the *Hudson* procedural requirements will be applied to TCU's dues reduction policies that were in place prior to March 1986. *See Gilpin v. Am. Fed'n of State, County and Mun. Employees,* 643 F.Supp. 733, 738 (C.D.Ill.1986) (*Hudson* procedural requirements applied retroactively), *aff'd,* 875 F.2d 1310 (7th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 278, 107 L.Ed.2d 258 (1989); *Harrison v. Massachusetts Soc'y of Professors/Faculty Staff Union/MTA/NEA,* 405 Mass. 56, 537 N.E.2d 1237, 1241 n. 7 (1989).

Plaintiffs argue that TCU's dues reduction procedures have been and are currently defective in seven respects. *First,* adequate information was not provided in the years 1985–87 to employees *before* the 30–day window for filing objections to the Union's fee. *Second,* the chargeable and non-chargeable expenditures in 1985–87 were not verified by a certified public accountant. *Third,* the Union did not provide for advance reduction of dues until 1988. *Fourth,* the arbitration process used to resolve disputes about the dues reduction does not satisfy the requirement for an independent decision maker. *Fifth,* the amount held in escrow while disputes are resolved is inadequate. *Sixth,* the Union's objection procedures have been and are unnecessarily burdensome, and its policy in force in 1985 to strongly encourage rescission of objections was unconstitutional. *Seventh,* the Union incorrectly classifies certain categories of expenditures as chargeable.

In addition to opposing most of these objections on the merits, the Union argues generally that plaintiffs should have exhausted existing arbitral procedures for resolving many of them. The Court will address each of the objections seriatim.

*Lack of advance information*

▮ In the years 1985–87 employees were required to object to the allocation of expenses during the first 30 days of each calendar year. They did not, however, receive any information regarding the fees to be charged until May 1986 for the fees charged in 1985 and 1986, and until April 1987 for the 1987 fee.

In *Hudson,* the Supreme Court held that one constitutional requirement for collecting a fee is that an adequate explanation of the basis for the fee must be provided to the employee. *Hudson,* 475 U.S. at 306–07, 106 S.Ct. at 1075–76. The Court noted that "potential objectors [must] be given sufficient information to gauge the propriety of the union's fee," and that requiring employees to object in order to receive the information inadequately protects their rights. *Id.* at 306, 106 S.Ct. at 1075. Thus, *Hudson* clearly indicates that adequate information must be given to all employees *prior* to the period for objections so that the employees may then determine if they wish to file an objection with the union. *See Damiano v. Matish,* 830 F.2d 1363,

1370 (6th Cir.1987); *Tierney v. City of Toledo,* 824 F.2d 1497, 1503 (6th Cir.1987).

Under these principles, the notice provided by the TCU to employees in the years 1985–87 was inadequate because it did not provide information before the employee had to object.

Since 1987 the Union has provided advance information to employees concerning the allocation between chargeable and nonchargeable expenditures and how the allocation was computed. The information is contained in an "audit protocol" that is prepared following guidelines devised by Professor Roger Hartley of the Catholic University School of Law. This information, which is submitted to all nonunion employees in April of each year, provides sufficient information from which the employees may determine whether they wish to object.

Even though the TCU was not in compliance during the years 1985–87 when it was not providing timely information, the four plaintiffs here nevertheless objected each year. Because none of the plaintiffs were injured by the TCU's temporary failure, the issue is now moot.

*Verification by independent auditor*

■ Plaintiffs contend that the verification of expense categories for allocation purposes must be performed by a certified public accountant who is independent of the Union. They also contend that Professor Hartley, who makes the allocation decisions for the Union, is not independent and does not verify the expense categories.

*Hudson* states that "[t]he Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. The Union argues that this requirement does not obligate the independent auditor to make the allocation decision between chargeable and nonchargeable expenditures. In this respect, defendant is correct. The purpose of the independent verification requirement is "to ensure that the expenditures which the union

claims it made for certain expenses were actually made for those expenses." *Andrews v. Education Ass'n of Cheshire,* 829 F.2d 335, 340 (2d Cir.1987). The auditor is not required to decide the legal issue of what is chargeable and what is not.

On the challenge by plaintiffs to Professor Hartley's independence, the mere fact that he was chosen unilaterally by the TCU, or paid by the TCU, does not mean that he is not independent. Even though the TCU now uses an accounting firm to verify its expenditures, it chooses the firm and pays for its services. These facts alone do not substantiate allegations of bias on the part of the accounting firm, nor do they cast doubt as to Professor Hartley's independence.

Nevertheless, the question remains whether Professor Hartley actually verified that "the expenditures which the union claims it made for certain expenses were actually made for those expenses." *Andrews,* 829 F.2d at 340. The typical audit protocol presented by this record, *see, e.g.,* Exhibit 25 to Declaration of Bobo, is not very helpful. It explains how the allocation decision was made by Professor Hartley, but it does not explain whether he verified that the claimed expenditures were made as claimed, even though the word "audit" is used liberally throughout the protocol. For example, with regard to operation expenses, the protocol explains "[t]he ratio for these expenditures was computed by auditing the Grand Lodge's ... financial records." Audit Protocol p. 2, Declaration of Bobo, Exhibit 25. This indicates how the ratio was computed but it does not assure employees that the financial records approximated reality. Nowhere is there any indication that Professor Hartley, whose calling is the law and not accounting, followed any accepted accounting principles. Significantly, the TCU does not argue in either its motion for summary judgment or its opposition to plaintiffs' motion that Professor Hartley actually verified the expenditures as a certified public accountant would have done and now does.

All of the deficiencies that are now raised, however, were apparent on the face of the protocols when submitted, and the plaintiffs failed to make these objections at that time by following the available arbitral process. They in fact received the reductions in dues, which they accepted. Even today there is nothing in the record to suggest that a verification of the amounts contained in the protocols would produce a difference.

Because the plaintiffs did not resort to the arbitration process made available to them, the Court will refrain from considering these issues in this posture.

*Advance reduction and interest-bearing escrow account*

■ The plaintiffs have challenged the method by which the Union escrowed disputed fees. They argue that under *Ellis* the Union is not entitled to use disputed fees, *even temporarily,* and that therefore only an advance reduction of dues is permitted. In 1985, the Union maintained an interest-bearing account in which it deposited an amount equal to one and one-half times the previous year's nonchargeable total. In 1986 and 1987, an amount equal to twice the previous years' nonchargeable totals was placed in escrow for a portion of the year, while an advance reduction was provided for the remainder of the year. Since 1987 the advance reduction of dues has been provided to nonunion members who object during the 30–day window.

Plaintiffs argue that in order to comply with the restrictions of *Hudson* and *Ellis* that disputed dues not be used for *any period* of time, the Union should have reduced its dues in advance in each year since 1985, even though *Ellis* held open the possibility of using interest-bearing escrow accounts. 466 U.S. at 444, 104 S.Ct. at 1890. ("there are readily available alternatives [to a pure rebate system], such as advance reduction of dues, *and/or* interest-bearing escrow accounts" (emphasis added)). In support of their position, plaintiffs cite to the Court the decisions in *Damiano*, 830 F.2d at 1369–70 (6th Cir.1987), and *Tierney,* 824 F.2d at 1504.

The Third and Fourth Circuits, on the other hand, have rejected the position urged by plaintiffs even though they were decided before *Hudson.* *Robinson v. State of New Jersey,* 741 F.2d 598, 612 n. 12 (3rd Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985), and *Beck v. Communications Workers of America,* 776 F.2d 1187, 1213 (4th Cir. 1985), *reh'g en banc,* 800 F.2d 1280 (4th Cir.1986), *aff'd,* 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988). Both of these cases relied on the Supreme Court's approval of interest-bearing escrow accounts in *Ellis.* After *Hudson* was decided, the Second Circuit approved a plan that provided an interest-bearing escrow account instead of an advance reduction. *Andrews,* 829 F.2d at 338, 339.

The Court concludes that under the decisions in *Beck* and *Andrews,* the procedures used by the Union even in 1985 were proper. While it would have been arguably fair for the Union to escrow the actual dues reductions based on the fee charged by the Union in the previous year, the TCU in this case escrowed one and one-half times the nonchargeable amounts in 1985 and twice the amounts in 1986 and 1987. The amounts escrowed fairly and properly acted as a safeguard against the possibility of "temporary loans" by the objecting employees. Furthermore, *Hudson* did not overrule *Ellis* and hold that interest-bearing escrow accounts could not be used. The interest-bearing account satisfies the requirement that the Union not be given a loan, even temporarily, which may be used for non-collective bargaining purposes. Therefore, the Union's escrow policies that were in place in the years 1985–87 and which were replaced by the total advance reduction system, did not violate the principles of *Ellis* and *Hudson.*

*Independent decision maker*

Plaintiffs contend that the TCU did not provide a reasonably prompt opportunity for them to challenge the amount of its fee before an impartial decision maker. *See Hudson,* 475 U.S. at 307–08, 106 S.Ct. at 1076.

While plaintiffs are not in a position to challenge the promptness of any decision regarding disputed fees, since they did not elect at any time to go through the arbitration process, they do challenge the independence of the arbitrators who are selected pursuant to the procedures established in 1986 by the American Arbitration Association ("AAA") from a preselected pool of labor arbitrators. Plaintiffs assert that the selection process is biased against employees and in favor of unions because the employees played no part in choosing the panel of qualified labor arbitrators from which individual arbitrators are selected, or the individual arbitrators themselves. The plaintiffs also argue that the AAA is institutionally biased against employees because (1) the AAA's Board of Directors includes prominent union officials, (2) union lawyers helped create the AAA agency fee arbitration rules, and (3) unions had recommended certain arbitrators to serve on the panel of labor arbitrators.

In *Andrews*, 829 F.2d 335, the court upheld the constitutionality of this very process against similar attacks that union officials sat on the board of the AAA, union lawyers were involved in drafting the rules, the list of arbitrators had been limited by agreement between the union and the AAA, and even some of the arbitrators may have held a bias. Moreover, in this case *none* of the plaintiffs proceeded to arbitration, and their challenge at best is a generalized attack based on general claims of bias. The Sixth and Seventh Circuits have held that general allegations of the type presented here are insufficient to establish a bias by the AAA. *See Ping v. Nat'l Educ. Ass'n*, 870 F.2d 1369, 1373–74 (7th Cir.1989); *Damiano*, 830 F.2d at 1371–72 (6th Cir.1987).

■ The AAA is "undeniably separate" from any union, and its selection of an arbitrator does not represent the "unrestricted choice" of the union. *See Hudson*, 475 U.S. at 308 n. 21, 106 S.Ct. at 1077 n. 21. Absent evidence of "pecuniary interest or personalized animus," *Andrews*, 829 F.2d at 340, the use of the AAA and its selection of arbitrators does not violate the requirements specified in *Hudson*.

This ruling, however, does not foreclose a challenge at a later time that is based on actual bias in a particular case or a challenge made to a particular rule, when and if a plaintiff has pursued arbitration. At that time, for example, the AAA rule which allows the union to waive the oral hearing could be challenged. *See Andrews*, 829 F.2d at 341.

*Escrow amount*

■ In addition to challenging the use of escrow accounts, as discussed above, the plaintiffs challenge the amounts placed in escrow by the Union. Apparently, the challenge extends both to the escrow account used from 1985–87 to hold a portion of the dues paid by objecting employees and the escrow account established in 1988 to hold amounts in dispute pending resolution of challenges to the allocation between chargeable and nonchargeable expenses. The defendants have labelled these separate escrow accounts "objector escrow" and "challenger escrow," respectively.

In the discussion, *supra*, the Court has already approved the adequacy of amounts placed in the objector escrow account. The amounts were established initially at one and one-half times the nonchargeable amount computed on the basis of the previous year's fees, and later at two times the amount.

As to the challenger escrow account, no plaintiff has ever challenged the fee reduction and therefore no plaintiff has been injured by a deficiency, if any, in the challenger escrow account. Consequently, no plaintiff has standing to challenge that escrow. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (plaintiff must plead a distinct and palpable injury that is fairly traceable to defendant's alleged conduct).

Even if the plaintiffs had challenged the Union's fee, it would be difficult for the plaintiffs to establish any violation. *Hudson* requires the union to place in escrow the amount that is reasonably in dispute. 475 U.S. at 310, 106 S.Ct. at 1077. The TCU asserts, without dispute, that it

escrows the amounts reasonably in dispute. Moreover, the TCU Constitution currently provides that the challenger escrow amount is to be determined by a "neutral referee." Declaration of Bobo, Exhibit 53.

*Objection procedures and the "discouragement" policy*

■ Plaintiffs allege that defendants have imposed overly restrictive procedures on the right to object to the Union's proposed fee. They contend that the 30–day window for objecting is too narrow and that the requirements that objections be made by each individual employee and be renewed annually are too burdensome. They also challenge the procedure required in earlier years that objections be mailed by certified mail and the policy pursued by the TCU in 1985 of discouraging objections.

The Court finds that the requirements for the annual renewal of objections and the 30–day window for making objections are not unduly restrictive of plaintiffs' rights. These are reasonable requirements of notice, since objections are not to be presumed on an on-going basis. The employee has the burden of notifying the union of his or her objection. *See Street,* 367 U.S. at 774, 81 S.Ct. at 1802 ("[D]issent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee."). Moreover, an employee who previously objected may have a change of heart and choose not to exercise his or her right to object in future years. *See Tierney,* 824 F.2d at 1506 (annual objection requirement not unreasonable).

Similarly, the 30–day window for making objections is not unreasonable. As the Second Circuit held in *Andrews,* the union is not required to provide the least restrictive procedure imaginable. *Andrews,* 829 F.2d at 340. The union, as well as the employees, have an interest in the prompt resolution of obligations and disputes. The 30–day window facilitates prompt resolution and leaves no doubt as to the timing or the requirement for making an objection. *See Andrews,* 653 F.Supp. 1373, 1378 (D.Conn.) (approving 30–day objection period), *aff'd,* 829 F.2d 335 (2d Cir.1987).

Plaintiffs complain that the Union, at least in the past, would not permit objections to be mailed in the same envelope. While the requirement might be aimed at facilitating processing, the Court believes that any redeeming purpose is outweighed by the undue burden the requirement places on the exercise of an employee's rights. The requirement is no longer in place, and none of the plaintiffs' objections in the past were ever rejected for failure to comply with the individual mailing requirement.

■ Plaintiffs also complain about the past procedure requiring the use of certified mail. Again the purpose of assuring that objections are received is outweighed by the burden and cost to the objector. But the TCU no longer requires this procedure and plaintiffs were reimbursed for the expense of certified mail.

With respect to both of these procedures, the issues are moot. There is no reasonable expectation that the requirements will be reestablished and their adverse effect has been suitably met by the Union. *See Matson Navigation Co. v. United States,* 825 F.2d 502, 503–04 (D.C.Cir.1987). Therefore, no relief need be afforded.

Finally, plaintiffs complain about a systematic program of harassment that was adopted in 1985 to encourage employees to rescind their objections. Under the program various Union officials sent letters to employees who had objected and made personal visits with them urging the employees to withdraw their objections. The Union does not deny the actions or the program, but it argues that the program did not encompass harassment and was not unconstitutional.

Although the Union has the responsibility to provide procedures that enable the employee to exercise statutory and First Amendment rights, *Hudson,* 475 U.S. at 307 n. 20, 106 S.Ct. at 1076 n. 20, it is likewise permitted to express views and engage in a dialogue on the merits of union membership. In balancing its obligation to preserve the rights of employees and exercising its own First Amendment rights, the Union must separate its propaganda mech-

anisms from the procedures designed to assure employees free exercise of their rights so as not to undermine or unduly burden the mechanisms. Moreover, it cannot "chill" First Amendment rights by any means that incorporate the use of threats, harassment or reprisals to individual employees. *Master Printers of America v. Donovan,* 751 F.2d 700, 704 (4th Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 52 (1985).

Samples of the Union's letters submitted by the plaintiffs were certainly forceful in their encouragement of rescinding objections. They did not, however, threaten anyone with reprisals or harassment. The fact that there were a number of letters is not of itself threatening or harassing.

With respect to the "one on one" visits by Union officials to objecting employees, plaintiffs have not submitted any specifics beyond the general allegations in the pleadings to establish harassment. There are no exhibits, affidavits, or depositions indicating that any of the individual plaintiffs were threatened with reprisals or otherwise harassed. In the absence of such support, summary judgment will be entered in favor of the Union on this issue. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

*Specific categories of expenditures*

Although plaintiffs attack three categories of expenditures that are currently classified by the Union as part of the cost of collective bargaining, none of them resorted to the arbitration procedures that were established pursuant to *Hudson* to pursue such a challenge. *See Hudson,* 475 U.S. at 311, 106 S.Ct. at 1078 (White, J., concurring) ("[I]f the union provides for arbitration and complies with the other requirements specified in our opinion, it should be entitled to insist that the arbitration procedure be exhausted before resorting to the courts."). Even though plaintiffs assert that they are not challenging the amount, only the classifications of expenditures, the arbitration process is the appropriate route for raising these issues since they are inextricably intertwined. Therefore, the Court

will refrain from ruling on these particular objections voiced by plaintiffs.

It may be observed, however, that each of the categories challenged has been addressed by courts previously. The plaintiffs' challenge to agency fees on collective bargaining efforts by units other than those to which plaintiffs belonged is undermined by the discussions in the various opinions in *Beck v. Communication Workers of America,* 776 F.2d 1187, 1210–13 (4th Cir.1985), *reh'g en banc,* 800 F.2d 1280 (4th Cir.1986), *aff'd,* 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988). *Cf. Ellis,* 466 U.S. at 448–50, 104 S.Ct. at 1892–93 (approving fees for *national* conventions and social activities of the *national* union). However, the plaintiffs' challenge to lobbying expenses of the Union finds support in the discussion in *Beck,* 776 F.2d at 1210–11. *But compare, Lehnert v. Ferris Faculty Ass'n,* 881 F.2d 1388, 1392 (6th Cir.1989) (lobbying expenses are chargeable to public-sector employees because of the unique relationship of public employees' working conditions to legislation); *Robinson v. New Jersey,* 741 F.2d at 609 (same). Finally, the plaintiffs' challenge to publication costs will depend on whether the substance of the publication falls within the scope of matters needed to carry out effectively the collective bargaining responsibility. *See Ellis,* 466 U.S. at 451, 104 S.Ct. at 1893.

## III. DUTY OF FAIR REPRESENTATION

Plaintiffs rest their challenge to the dues reduction procedures of the Union not only on constitutional and statutory grounds but also on the contention that the procedures violate the Union's duty of fair representation. Both parties have given this issue only cursory treatment in their papers and at oral argument. The Court will nevertheless address the contention briefly as it is raised in Count III of the complaint.

A union's duty of fair representation derives from the union's position as the exclusive bargaining representative for the employees. *See Steele v. Louisville & Nashville Railroad Co.,* 323 U.S. 192, 207, 65

S.Ct. 226, 234, 89 L.Ed. 173 (1944). Under this duty, the exclusive bargaining representative must serve the interests of all employees covered by the collective bargaining agreement, whether or not they are union members. In doing so, the union must act in good faith and honesty, while avoiding arbitrary or discriminatory conduct. *Vaca v. Sipes*, 386 U.S. 171, 177, 190, 87 S.Ct. 903, 909, 916, 17 L.Ed.2d 842 (1967).

The current dues reduction procedures employed by the TCU do not violate the duty of fair representation. Nonunion members are provided with an adequate explanation of the Union's fee; the calculation is verified by an independent auditor; an opportunity is provided, within a reasonably prompt time, to challenge the fee calculation before an impartial decision maker; and an escrow account is established to hold the amounts reasonably in dispute pending a decision by the impartial arbiter. In providing for these procedures, the Union has not acted arbitrarily, in bad faith, or in a discriminatory manner toward any of the nonunion employees.

Procedures used in previous years have, in some instances, been found to be improper as discussed earlier in this Opinion. To the extent that these improper procedures violate a duty of fair representation, any remedy is precluded for the reasons described above.

## IV. CONCLUSION

For the reasons given in this Opinion, the cross motions for summary judgment will be granted in part and denied in part, as follows:

1. The motion of plaintiffs for summary judgment will be granted to the extent that the TCU shall afford to Kidwell and others similarly situated the right to object and receive a reduction in dues to the same extent and in the same manner as afforded to nonunion employees. In all other respects, the motion will be denied.

2. The motion of the TCU for summary judgment will be granted, except as provided in paragraph one.

A separate Order entering judgment as provided in this Opinion will be entered.